IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **DICKEY'S BARBECUE RESTAURANTS, INC.,** | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. **3:11-CV-2804-L** |
| **GEM INVESTMENT GROUP, L.L.C, JAMES SLOPAK, and CHERYL L. PORTER-SLOPAK,** | § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Plaintiff's Second Amended Complaint and Application for Injunctive Relief, filed December 19, 2011, and Plaintiff's Motion for Preliminary Injunction, filed January 9, 2012. The court held an evidentiary hearing on the application for injunctive relief on December 22, 2011, December 23, 2011, and December 28, 2011. After carefully considering the application, motion, responses, objections,[*] evidence, and applicable law, the court **denies** Plaintiff's Application for Injunctive Relief and Plaintiff's Motion for Preliminary Injunction.

---

[*]Plaintiff Dickey's Barbecue Restaurants, Inc. filed Plaintiff's Objections to Defendant's Evidence on December 22, 2011. The court **overrules** Plaintiff's Objections to Defendant's Evidence, as it may rely on generally inadmissible evidence in deciding a preliminary injunction and has only considered evidence that it deems reliable and necessary to its ruling. *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *Petrello v. Nath*, 350 F. App'x. 887, 891 (5th Cir. 2009) (holding that, in deciding a preliminary injunction, "the district court may employ informal procedures and rely on generally inadmissable evidence") (quoting *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993)).

I.  **Factual and Procedural Background**

On October 19, 2011, Dickey's Barbecue Restaurants, Inc. ("Plaintiff" or "Dickey's") filed Plaintiff's Original Complaint and Application of Injunctive Relief against Defendants GEM Investment Group, L.L.C, James Slopak, and Cheryl L. Porter-Slopak (collectively, "Defendants"). On January 29, 2011, Cheryl and James ("Jim") Slopak (collectively, the "Slopaks") signed an area development agreement ("Development Agreement") for the right to develop three Dickey's Barbecue Pit restaurants in the cities of Yelm; Olympia; and South Hill or Puyallup in Washington State and paid Dickey's a $30,000 development fee. At the same time they signed the Development Agreement, the Slopaks signed a written franchise agreement ("Franchise Agreement") for the first franchised location to be developed under the Development Agreement. Plaintiff now sues Defendants for an alleged breach of the Franchise Agreement executed on January 29, 2011.

The Franchise Agreement contains two covenants not to compete—one for existing franchisees ("In-Term Covenant") and another for former franchisees ("Post-Term Covenant"). The "In-Term Covenant" states that during the term of the Franchise Agreement:

> A. [N]either you nor any of your Principals shall, either directly or indirectly, for yourselves or through, on behalf of or in conjunction with any person(s), partnership or corporation:
>
>> ii.    Own, maintain, operate, engage in or have any financial or beneficial interest in (including any interest in corporations, limited liability companies, partnerships, trusts, unincorporated associations, joint ventures or other entities), advise, assist or make loans to, any person or entity engaged in any business which is the same as or similar to the franchised business including, but not limited to, any food business which offers barbecue-style food as a primary menu item.

Franchise Agreement (Doc. 16) Dickey's 000135-36, ¶ 2(A).  The Post-Term Covenant states that "for a continuous uninterrupted period commencing upon the expiration or termination of, or transfer of all of your interest in this Agreement" and for two years thereafter:

> B. [N]either you nor any of your Principals shall, either directly or indirectly, for yourselves or through, on behalf of or in conjunction with any person(s), partnership or corporation:
>
>> iii.   Own, maintain, operate, engage in or have any financial or beneficial interest in (including interest in corporations, limited liability companies, partnerships, trusts, unincorporated associations, joint ventures or other entities), advise, assist or make loans to, any business which is the same as or similar to the franchised business including, but not limited to, any food business which offers barbecue-style food, which business is, or is intended to be, located within a thirty (30)-mile radius of the location accepted hereunder or within a five (5)-mile radius of any Restaurant in existence or under construction as of the earlier of: (a) the expiration or termination of, or the transfer of all of your interest in, this Agreement; or (b) the time your Principal ceases to satisfy the definition of your Principal, as applicable.

Franchise Agreement (Doc. 16) Dickey's 000136, ¶ 2(B).

The Franchise Agreement also contains a provision, referring to Article 18 that contains the covenants not to compete, that states:

> 6.   You and your Principals acknowledge that a violation of the terms of this Article 18 would result in irreparable injury to Dickey's for which no adequate remedy at law may be available, and you and your Principals accordingly consent to the issuance of an injunction prohibiting any conduct by you or any of your Principals in violation of the terms of this Article.  This remedy is in addition to any other remedies Dickey's may have hereunder or at law or equity.

Franchise Agreement (Doc. 16) Dickey's 000137, ¶ 6.

As residents of Yelm, Washington, the Slopaks were familiar with the real property located at 35119 State Route 507 South, McKenna, Washington 98558 (near Yelm, Washington), a freestanding building that housed the McKenna Y restaurant for more than twenty years ("McKenna Location").  In May 2011, the McKenna Location became available for

**Memorandum Opinion and Order – Page 3**

lease, and the Slopaks signed a five-year lease, anticipating that it would be the site of their first Dickey's Barbecue Pit restaurant. Defendants hired NC Structures, L.L.C. as their general contractor, and NC Structures L.L.C. suggested to the Slopaks that George Hanson Architects, Inc., P.S., be retained to coordinate building permits and other jurisdictional approvals.

The Slopaks attended initial franchise training in Dallas, Texas. Although, the training was scheduled to last three weeks, from July 11 to July 29, 2011, they only attended class through July 18, 2011. The events leading to Defendants' decision to end their training are disputed by the parties. Defendants state that during the first two days of training, they asked several questions related to the operation of their franchised restaurant. Defendants inquired, for example, about whether they could serve a different type of potato salad (with less mustard) in their restaurant to appeal to the tastes of customers in the Northwest. Hr'g Tr. 43-44, Dec. 22, 2011. Former Dickey's Director of Training, Paula Suarez (Hr'g Tr. 119-20, Dec. 22, 2011), found the comment insulting. Hr'g Tr. 53, Dec. 22, 2011. Defendants were asked to report for a meeting the afternoon of the third day of training (July 13, 2011) with Paula Suarez and Laura Dickey, wife of Dickey's Chief Executive Officer and President, Roland Dickey, Jr. (Hr'g Tr. 49-50, Dec. 22, 2011). According to Defendants, Laura Dickey stated that she did not think Defendants were "a good fit for the Dickey's family," and asked Defendants if they really wanted to be a part of the Dickey's family. Decl. of Cheryl Slopak (Doc. 19) 2, ¶ 9; Hr'g Tr. 53-54, Dec. 22, 2011. According to Cheryl Slopak, "[I]t wasn't a very pleasant meeting." Hr'g Tr. 50, Dec. 22, 2011.

Defendants attended training five additional days after the meeting. On July 19, 2011, Cheryl Slopak e-mailed Laura Dickey notifying her of the Slopaks' intent to "drop out of" the training program   Defendants packaged all of the training materials that they received from

**Memorandum Opinion and Order – Page 4**

Dickey's and shipped them to Dickey's from an Office Depot near the hotel they stayed in during the training prior to returning home. Defendants did not make copies of any training materials prior to sending the materials back.

The Slopaks notified George Hanson, whose firm was responsible for assisting with the building permit and health department approvals, that the McKenna Location would not be a Dickey's Barbecue Pit. During a meeting on July 28, 2011, the Slopaks met with George Hanson, Attorney Jan Gossing, and Ray Nakamura (principal of NC Strucures, L.L.C. and the Slopaks' general contractor) to discuss changing the restaurant into Jim Bob's Chuck Wagon. George Hanson assisted Cheryl Slopak in rewriting the menu and food handling procedures to conform to Tacoma Pierce County Health Department requirements for sanitation and temperature control. The menu was expanded or modified to include breakfast, burgers, French fries, and a variety of sandwiches, salads and soups. During construction, the Slopaks altered the wood wall paneling from Dickey's standard specification; developed a different wood finish; purchased different chairs; and eliminated the corrugated metal and masonry finishes to avoid appearance similarities with Dickey's Barbecue Pit. The restaurant never operated as a Dickey's. Jim Bob's Chuck Wagon opened for business on October 19, 2011, and currently employs twelve individuals.

## II.   Legal Standard for Preliminary Injunction

There are four prerequisites for the extraordinary relief of a preliminary injunction. A court may grant a preliminary injunction only when the movant establishes that:

> (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury [to the movant] outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest.

*Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citing *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (*en banc*)). The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a preliminary injunction can be granted. *Mississippi Power & Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985); *Clark*, 812 F.2d at 993. Otherwise stated, if a party fails to meet any of the four requirements, the court cannot grant the preliminary injunction.

### III.    Analysis

Plaintiff requests the court to issue a preliminary injunction, enjoining Defendants from operating Jim Bob's Chuck Wagon during the pendency of this action. In the alternative, Plaintiff requests that the court enjoin Defendants from serving barbecue-style food at Jim Bob's Chuck Wagon. Defendants argue that Plaintiff is not entitled to a preliminary injunction because it cannot show that it will prevail on the merits, suffer irreparable injury, and suffer greater harm than Defendants; and argue that Plaintiff cannot show that granting a preliminary injunction will serve the public interest.

The dispositive question presented by Plaintiff's Application for Injunctive Relief is whether it has established a substantial threat of irreparable injury. The court, however, will first address the preliminary question of one's consent to a preliminary injunction.

#### A.    Consent to Injunction

Plaintiff contends that under the terms of the Franchise Agreement, Defendants acknowledged that a violation of the covenant not to compete will result in irreparable harm to Dickey's for which no adequate remedy at law may be available and consented to the issuance of an injunction. *See* Franchise Agreement (Doc. 16) Dickey's 000137, ¶ 6. Other courts have found that "[c]ontractual stipulations of 'irreparable harm,' however, are insufficient by

**Memorandum Opinion and Order – Page 6**

themselves to support a finding of irreparable harm to support injunctive relief." *Traders Int'l, Ltd. v. Scheuermann*, 2006 WL 2521336, *8 (S.D. Tex. Aug. 30, 2006) (citing *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004) "While courts have given weight to parties' contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, they nonetheless characteristically hold that such statements alone are insufficient to support a finding of irreparable harm and an award of injunctive relief."). The court finds this rationale persuasive. As preliminary injunctive relief is an extraordinary remedy, the court determines that a provision in a contract providing that breach would cause irreparable harm is merely one factor to be examined in making the irreparable harm determination.

### B.  Irreparable Harm

Assuming without deciding that Dickey's has carried its burden with respect to each of the other three factors, the court now turns to whether it has made the required showing of a substantial threat of irreparable harm. To meet this burden, Dickey's must demonstrate "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986) (citations omitted). "A showing of speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (internal citations and quotation marks omitted).

Dickey's contends that in Texas, "injury resulting from the breach of non-compete covenants is the epitome of irreparable injury" and that "where trade secrets and [goodwill] are involved, the [threat] is significant that the harm experienced will be irreparable." Br. in Supp. of Pl.'s Mot. for Prelim. Inj. 14 (citing *American Express Fin. Advisors v. Scott*, 955 F. Supp.

**Memorandum Opinion and Order – Page 7**

688, 693 (N.D. Tex. 1996)). In *Scott*, the defendant worked as a financial advisor for the plaintiff and signed a contract stating that he could not solicit the plaintiff's customers for one year in the territory in which he worked should he terminate his affiliation with the plaintiff. Prior to resigning with the plaintiff, the defendant sent a letter on the plaintiff's letterhead to customers whom he served while affiliated with the plaintiff explaining that he was changing his affiliation to a competitor in order to provide better service. *Scott*, 955 F. Supp. at 690. The court determined that the plaintiff would suffer irreparable injury without injunctive relief and that it would suffer harm in terms of lost customer goodwill and business. *Id.* at 693. The *Scott* decision relies heavily on *Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F. Supp. 1349 (N.D. Tex. 1991), *aff'd*, 948 F.2d 1286 (5th Cir. 1991) (table decision), *cert. denied*, 504 U.S. 930 (1992). Similarly, in *Ruscitto*, the defendant employer applied for a preliminary injunction, where the plaintiff employee sent letters to customers whom he served while working for the defendant, soliciting their brokerage business and explaining that he was changing his affiliation to a competitor. The court determined that "[t]he factual record supports a finding that [the defendant] is threatened with irreparable injury by [the plaintiff's] breach of the Agreement," and the defendant would suffer harm in terms of "lost customer goodwill, trade secrets, and lost business." *Ruscitto*, 777 F. Supp. at 1354. The court determines that these cases are factually distinguishable from the case at hand.

### 1. Lost Customer Goodwill and Lost Business

Dickey's has not demonstrated that it will suffer irreparable harm in terms of lost customer goodwill or lost business. Based on the evidence presented at the hearing (testimony of Laura Dickey), Dickey's is new to the Washington area. Hr'g Tr. 40, Dec. 23, 2011. The first Dickey's restaurant to open in the State of Washington opened in November 2011. Hr'g Tr. 40-

41, Dec. 23, 2011. Defendants' restaurant, Jim Bob's Chuck Wagon, opened on October 19, 2011. Decl. of Cheryl Slopak (Doc. 19) 4, ¶ 22. At the time Dickey's filed Plaintiff's Original Complaint and Application for Injunctive relief on October 19, 2011, it had no stores open in Washington, and, thus, no customer base or established goodwill in the state. Defendants produced evidence that the Dickey's franchise that opened in November 2011, is located in Bonney Lake, Washington, which is just under thirty-five miles from the Slopak's restaurant. Decl. of Christianne Edlund (Doc. 19) 52, ¶¶ 2-3 and Exhs. A and B thereto. As of December 19, 2011, Plaintiff had no other *open* restaurants in the State of Washington. Decl. of Christianne Edlund (Doc. 19) 52, ¶ 4. At the time of the hearing, Plaintiff produced evidence that it had three franchisees in Washington. Hr'g Tr. 40, Dec. 23, 2011.

The McKenna Location was never operated as a Dickey's Barbecue Pit; the location never reflected any Dickey's Barbecue Pit signage; and neither the Slopaks nor Dickey's issued any press release or advertisement signaling the opening of a Dickey's restaurant at the McKenna Location, except to post "Coming Soon to McKenna, Washington" on the Dickey's website. Decl. of Cheryl Slopak (Doc. 19) 4, ¶ 23. Defendants' evidence demonstrates that after deciding not to open a Dickey's restaurant, they made changes to the interior of the restaurant by changing the interior finishes and wall paneling, removing corrugated metal and masonry finishes, and buying new chairs and tablecloths. Decl. of Cheryl Slopak (Doc. 19) 4, ¶ 20.

Dickey's has only recently begun operating in the State of Washington. Plaintiff has not provided evidence that it had any established customer base or goodwill in the state at the time it applied for injunctive relief. The court believes Plaintiff's alleged injury is speculative and seriously questions the imminence of Plaintiff's alleged harm. Dickey's has not persuaded the court that it will suffer irreparable harm in terms of lost customer goodwill or lost business.

**Memorandum Opinion and Order – Page 9**

### 2. Trade Secrets

Dickey's asserts that an injunction is usually the only way to prevent the use of a trade secret. Br. in Supp. of Pl.'s Mot. for Prelim. Inj. 14. Dickey's, however, has not persuaded the court that it will suffer irreparable harm with respect to its alleged trade secrets. In determining whether to grant protection to a trade secret by a preliminary injunction, the trial court determines whether the applicant has established that the information necessitates trade secret protection before the trial on the merits. *See FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504 (5th Cir. 1982). ("Without a preliminary injunction, a threat exists that those FMC trade secrets known to [Defendant] will be lost before a full trial on the merits could be held.") In *FMC Corp.*, the court determined,

> Given the facts of this case – that FMC has trade secrets, that [Defendant] has knowledge of at least some of those secrets, and that [Defendant] has been placed in a comparable position with a direct competitor without restriction against using or disclosing FMC's trade secrets – the fear of irreparable injury is realistic.

*FMC Corp.*, 677 F.2d at 505. The court's analysis is instructive, as it focused on whether the plaintiff possessed trade secrets; whether the defendant learned such trade secrets; and whether the defendant was in a position to use the trade secrets to the plaintiff's detriment.

Whether Defendants learned and employs Dickey's trade secrets is the source of much contention in this lawsuit. A trade secret is "any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003) (quoting *Hyde Corp. v. Huffines*, 314 S.W.2d at 766, (Tex. 1958)).

Plaintiff states that during its training program, Defendants were provided with two of Plaintiff's sauce recipes in their recipe book for sweet and spicy sauce. The evidence shows that Dickey's has its own proprietary sauce and instructs franchisees to mix it with syrup to make it sweet or cayenne pepper to make it spicy. Hr'g Tr. 45-46, Dec. 23, 2011. The proprietary sauce is prepackaged, and franchisees would be unable to recreate it. *Id.* Dickey's franchisees are instructed that the closest flavor profile to Dickey's barbecue sauce is Cattlemen's. *Id.* The evidence shows that Defendants use Cattleman's sauce in their restaurant, and Cheryl Slopak adds brown sugar to Cattleman's sauce to make it sweet. Hr'g Tr. 64, Dec. 22, 2011. The court is not convinced that use of another name brand sauce is proprietary to Dickey's or that Defendants' alteration of the Cattlemen's base sauce is similar to Dickey's alteration.

Dickey's states that its "from-scratch" recipes, including green beans and cole slaw, are taught during the training course, and Defendants sell cole slaw and green beans with bacon and onion, which are served at Dickey's. Plaintiff, however, has provided no evidence that the Slopaks are using *its* cole slaw or green bean recipe. Laura Dickey testified that she did not know whether Defendants were using Dickey's cole slaw or green bean recipe. Hr'g Tr. 58, Dec. 23, 2011. Defendants offered evidence that they do not use any of Dickey's recipes to operate their restaurant, and they serve recipes developed by Cheryl Slopak and her family. Hr'g Tr. 38-39, 61, Dec. 22, 2011.

Dickey's argues that the Defendants learned its techniques for ordering, selecting, preparing, cooking, resting, and cutting barbecued meats. Plaintiff, however, has not provided sufficient evidence that Defendants learned its meat preparation methods during training. Dickey's provided evidence that there are two days out of four in week one of training that Defendants would have been in the restaurant to learn these methods. Hr'g Tr. 58-59, Dec. 23,

2011. Plaintiff's witness, Laura Dickey, however, did not know for sure which training sessions Defendants attended at the restaurants. *Id* at 59-60. Cheryl Slopak testified that in the first week of training, she and her husband did not go to a Dickey's restaurant on Monday, Tuesday, or Wednesday. Hr'g Tr. 83-84, Dec. 23, 2011. She testified that on Thursday of that week, they trained at the Wycliff Dickey's restaurant but were unable to learn how to prepare the meat because the smoker was broken, and they helped clean the restaurant to prepare for opening instead. Hr'g Tr. 84-85, Dec. 23, 2011. Cheryl Slopak testified that on Friday, she and her husband took a test. Hr'g Tr. 84-85, Dec. 23, 2011.

Dickey's elicited testimony from Cheryl Slopak that meat plates comprise 23.79 percent of Jim Bob's Chuck Wagon's sales, which includes barbecued meats along with other meats, such as chicken fried steak and hamburger steak (approximately five to eight percent). Hr'g Tr. 32-33, Dec. 22, 2011; *see also* Pl.'s Exh. 8 ([Doc. 19 at 23]). The evidence also demonstrates that Jim Bob's Chuck Wagon serves barbecued meat on its sandwiches and salads, and sandwiches and salads comprise 13.18 percent of sales and 1.96 percent of sales, respectively. Hr'g Tr. 86-87, Dec. 22, 2011; *see also* Pl.'s Exh. 8. Cheryl Slopak also testified that the meat plates sold at Jim Bob's Chuck Wagon are similar to those sold by Dickey's. Hr'g Tr. 86, Dec. 22, 2011. Defendants presented evidence that they cook their barbecue in a different manner than does Dickey's by treating it with liquid smoke and then cooking it in a gas-fired convection oven, whereas Dickey's smokes its meat using hickory wood. Hr'g Tr. 101-102, Dec. 23, 2011; Decl. of Cheryl Slopak (Doc. 19) 5, ¶ 26. Defendants provided evidence that they are unable to smoke their meat because of the hood system located in their restaurant. Hr'g Tr. 34, Dec. 23, 2011. Defendants also provided evidence that Cheryl Slopak uses her own barbecue "rub" and

has also obtained barbecue "rub" from a family friend in Richmond, Texas. Hr'g Tr. 102, Dec. 22, 2011.

Dickey's asserts that Defendants received a confidential operations manual at training and a recipe book. Defendants, however, provided evidence that they returned the operations manual and all other materials provided to them prior to returning to their home in Washington. Hr'g Tr. 24, Dec. 22, 2011. Defendants also provided evidence that they did not make copies of any of Plaintiff's materials and have nothing in their possession relating to the Dickey's franchise other than two shirts. Hr'g Tr. 61, Dec. 22, 2011.

Dickey's also asserts that its proprietary information provided to Defendants includes the layout of the restaurant, organization of the kitchen, costs of goods sold, line setup, point of sale system, staffing, scheduling, and staff management. Plaintiff states that "Defendants took this information and opened their own restaurant serving barbecued meats in direct breach of the Franchise Agreement between the parties at the location originally selected to be a Dickey's Barbecue Pit . . ." Br. in Supp. of Pl.'s Mot. for Prelim. Inj. 10. Defendants offered evidence that the McKenna Location was an existing restaurant, and they made certain modifications to the front area, including removing a partial wall and removing the dishwasher situated behind the wall to make room for a steamer table. Hr'g Tr. 72, Dec. 22, 2011. The restaurant had an existing counter, but Defendants extended the counter where there was previously an open area for employees to pass through, and where there is now a cash register or point of sale system. Hr'g Tr. 72-73, Dec. 22, 2011. Defendants also offered evidence that after they decided not to run a Dickey's restaurant, they directed George Hanson to change the design to differentiate it from a Dickey's Barbecue Pit. Hr'g Tr. 25-26, Dec. 22, 2011. Defendants presented evidence that they changed the interior finishes and wall paneling; changed the wood finishes; removed

corrugated metal and masonry finishes; and bought new chairs and tablecloths.  Decl. of Cheryl Slopak (Doc. 19) 4, ¶ 20.  Defendants also presented evidence that they expanded their menu to offer breakfast, hamburgers, and an assortment of sandwiches and salads.  Decl. of Cheryl Slopak (Doc. 19) 4, ¶ 21.

Plaintiff has not persuaded the court that Defendants learned its alleged trade secrets and are using them.  *See FMC Corp.*, 677 F.2d at 505 (finding the fear of irreparable injury was realistic where the plaintiff possessed trade secrets, the defendant had knowledge of at least some of those secrets, and the defendant had been placed in a position with a direct competitor without restriction against using or disclosing the plaintiff's trade secrets).  Plaintiff has also not provided sufficient evidence that Defendants are in direct competition with it and are using or disclosing its alleged trade secrets.  *See id.*  Where Defendants attended training for just over a week, returned all training materials, use their own recipes, cook their barbecued meat in a different manner, offer a variety of foods, and leased an existing restaurant building in a state where Dickey's has no established good will or customer base, Plaintiff has not met its burden of persuasion that it will suffer irreparable injury with respect to its trade secrets.  The court also finds that Plaintiff's concern with respect to its goodwill and lost business is speculative and not imminent.  As Plaintiff has not met its burden of showing irreparable harm, it has not established that it is entitled to injunctive relief before the trial on the merits.  This is not a case where the extraordinary remedy of preliminary injunctive relief is warranted.

## IV.    Conclusion

For the reasons herein stated, the court **concludes** that Dickey's has not met its burden of proving that there is a substantial threat that irreparable harm will result if the preliminary injunction is not granted.  Because a preliminary injunction should be granted *only* if the movant

**Memorandum Opinion and Order – Page 14**

has clearly carried the burden of persuasion on all four elements, *see Mississippi Power & Light*, 760 F.2d at 621, and because Dickey's has failed to carry its burden of proving a substantial threat of irreparable harm, the court need not address the remaining three elements. Accordingly, the court determines that Plaintiff is not entitled to a preliminary injunction prior to a trial on the merits. Therefore, the court **denies** Plaintiff's Application for Injunctive Relief and Plaintiff's Motion for Preliminary Injunction.

**It is so ordered** this 18th day of April, 2012.

                                             Sam A. Lindsay
                                             United States District Judge